**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MARIO FLORES, | ) |
| | ) |
|                  Petitioner, | ) |
| | ) |
|           v. | )      No. 94 C 2076 |
| | ) |
| RICHARD GRAMLEY, | )      Judge John A. Nordberg |
| | ) |
|             Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

This case has an unusual procedural history. Many years ago, petitioner Mario Flores filed a 14-count petition for writ of habeas corpus in which he challenged his conviction for murder and armed robbery and his sentence of death. The parties filed extensive briefs, including a number of supplemental briefs addressing changes in the law. Then, as this Court was in the process of preparing a ruling, the Governor of Illinois commuted all death sentences in Illinois. In three cases, the Governor commuted the sentences to 40 years "to fairly bring their sentences into line with their co-defendants and to reflect the other extraordinary circumstances of each of these cases." (1/11/03 Statement of Governor Ryan.) Petitioner's case was one of these three. Although the Governor did not explain (insofar as we know) specifically why he included petitioner's case in this special group, one likely reason is that Harry Gomez, a co-defendant who was tried separately from petitioner, received a 40-year sentence for similar conduct while petitioner was sentenced to death.

After this unusual decision by the Governor, the parties appeared in Court for a status hearing. At that time, petitioner was not sure whether he wanted to proceed with his petition as there was some uncertainty about, among other things, whether legal challenges might be made against the Governor's decision. With the agreement of the parties, this Court stayed this action and set periodic status hearings. Meanwhile, in 2004, petitioner completed his prison term and was released. Because petitioner was a Mexican national, he was deported where he now lives with his parents.

In 2006, petitioner's counsel informed this Court that, although he believed that his sentence claims (Counts VIII-XIV) were moot, his trial error-claims (Counts I-VII) were not and that he wished to proceed with the resolution of them because his conviction affects, among other things, his deportation. Counsel further stated that, because of the lapse of time since the prior briefing, he wanted to do further research to see if there were any additional cases and he also stated that a significant decision relating to one issue, which was the claim that the Chicago Police failed to notify the Mexican Consulate of petitioner's arrest as required by the Vienna Convention, had been issued. Without objection from the State, this Court set a schedule for supplemental briefs by both sides. Petitioner's counsel requested a number of extensions of time to file his initial brief. Petitioner eventually filed a two-page submission stating that, with respect to the issue under the Vienna Convention, the Supreme Court had decided the case against petitioner. *See Sanchez-Llamas v. Oregon*, 126 S.Ct. 2669, 2687 (2006) ("claims under Article 36 of the Vienna Convention may be subjected to the same procedural default rules that apply generally to other federal-law claims"). Counsel also stated that he did need find any supplemental authority that was relevant to the case. The State likewise did not submit any

additional cases or arguments. Nor has the State suggested that this case is moot because petitioner has been released from prison. *See A.M. v. Butler*, 360 F.3d 787, 790 (7th Cir. 2004). The end result is that, although half of the claims have now been eliminated and the stakes are now greatly reduced, petitioner still wishes to proceed with his remaining claims.

## **BACKGROUND**

To provide an initial overview, we quote the summary of facts set forth in the Illinois Supreme Court's decision on direct appeal:

> Evidence at trial showed that on January 1, 1984, the body of the victim, Gilbert Perez, was discovered in an alley at 2259 West St. Paul Avenue in Chicago. Next to the body were four spent shotgun shells and another shell was found three to six feet away. It was stipulated that the cause of death was multiple shotgun wounds resulting in massive injuries to the head, chest and internal organs.

> Nancy Lebron testified that she lives in a second floor apartment at 2351 North Avenue in Chicago, which overlooks the intersection of North and Western Avenues. On January 1, 1984, at approximately 2 a.m., Lebron heard what sounded like an auto accident, and looking out her window, she saw a car which had been driven against an electrical light pole at the corner of the intersection. Shortly thereafter, the defendant and Victor Flores, who is not related to the defendant, drove up in a wine colored car and parked a short distance from the intersection. They were later joined by another man, who was driving a black and green car. Gilbert Perez, whom Lebron knew as "Blue Eyes," got out of the car that was parked against the electric pole and was approached by the men in the other two cars.

> One of the men put his arms around Perez and, she said, talked to him "as if they were good friends." Meanwhile, the defendant returned to the car he was driving, removed a shotgun from the trunk, and pointed it in the direction of Perez. After one of his companions shouted at him, the defendant put the gun into the backseat of the car and returned to the group. Perez walked to the wine colored car and sat in the front passenger seat. The defendant sat in the backseat and Flores drove away. Lebron stated that as the wine colored car drove off following the green and black colored car, she wrote down its license plate number, "AA 959," and handed it to her husband.

Rinaldo Guevara, a Chicago police officer and gang crimes specialist with the Chicago police department, testified that on November 10, 1984, he spoke with Lebron, after receiving an anonymous telephone call from a man who said Lebron might have information concerning Perez' death. From an array of photographs, Lebron identified a photograph of the defendant and that of Sammy Ramos and stated that she had seen them with the victim at the intersection of North and Western Avenues on January 1, 1984. Lebron also identified the defendant from a lineup as the man who she saw carrying the shotgun, and Victor Flores, as the man that was driving the wine colored car when it left Perez. Guevara testified that the defendant was arrested driving a burgundy, 1982 Buick Regal with the license late number "AA 9559," which was registered to Lena Flores, the defendant's sister.

Victor Flores testified that in the early morning hours of January 1, 1984, the defendant, driving his sister's 1982 Buick Regal, picked him up. As they were driving down North Avenue, a car driven by Perez passed them at a high rate of speed. They stopped at the intersection of North and Western Avenues where Perez' car, which appeared to have been in an accident, rested against an electric pole. A few minutes later, Harry Gomez arrived and parked next to them. While they were talking, Gilbert Perez got out of his car and began shouting at a woman in the intersection who was involved in the accident. Flores stated that he, the defendant and Gomez walked to the intersection and approached Perez, who began to threaten them. At one point, Perez made a "pitchfork" signal, which, according to Flores, meant Perez was a member of a street gang known as the Latin Stylers.

Flores testified that the defendant returned to his car, removed a shotgun, and approached the group. After Gomez confronted the defendant, he put the shotgun into the backseat of the car. Gomez then put his "arm around" Perez and led him to the defendant's car. Perez sat in the front seat and the defendant, with the shotgun in his hand, sat in the backseat. Flores drove the defendant's car and followed Gomez several blocks until they stopped on St. Paul Avenue. Flores testified that during the ride the defendant told Perez that Gomez was "Mousey" from the "D's." He explained that "D's" were a street gang affiliated with a larger gang known as the "Folks," and that they were enemies of the gang he and the defendant belonged to, the Latin Brothers.

After the defendant, Gomez and Perez got out of the cars on St. Paul Avenue, Flores drove the car approximately 40 feet, and as he was turning the car around, he heard "four or five" gunshots. In his side, rearview mirror, Flores saw Perez lying on the ground and the defendant standing next to the body with the shotgun in his hand. Gomez was bending over Perez touching his "upper neck." Flores stated he then drove away but Gomez and the defendant caught up with

him and directed him to Gomez' house. There, he saw Gomez with a "handful of chains" (chain necklaces) that Gomez said belonged to Perez.

Sammy Ramos testified on behalf of the State under a grant of immunity. On direct examination, he stated that he could not recall having a conversation with the defendant concerning the death of Perez. Ramos stated that he did recall testifying before the grand jury on November 13, 1984, but could not recall the content of his testimony. After receiving the transcript of the grand jury proceedings to refresh recollection, Ramos acknowledged that it contained an accurate description of his grand jury testimony. Upon further questioning, Ramos acknowledge he testified before the grand jury that on January 7, 1984, the defendant told him that on New Year's Eve, he and Victor Flores encountered Perez and Harry Gomez at the scene of an accident at the intersection of North and Western Avenues. The defendant said he became angry after Perez started swearing at a women who was also involved in the accident. He removed a shotgun from the trunk of his car but put it back after Gomez told him to do so. Gomez then told Perez that he was a member of the "Folks" gang, whereupon Perez stated that he was "Blue eyes from the Stylers." The defendant said that the four men drove to Western Avenue and St. Paul Avenue, where he shot Perez six times and Gomez took the victim's chain necklaces from his body.

At the close of the evidence, the jury found the defendant guilty of murder and armed robbery. Thereafter, a hearing was held on the State's motion to seek the death penalty. The jury found the defendant subject to the death penalty, being 18 years of age or older at the time of the murder and having killed the victim in the course of a forcible felony, to wit, armed robbery. (Ill.Rev.Stat. 1983, ch. 38, par. 9-1(b)(6)).

At the second phase of the hearing, the State presented in aggravation evidence of the defendant's juvenile adjudications for retail theft, criminal trespass of a vehicle, and possession of a stolen vehicle. Each of these adjudications resulted in the defendant's being placed on probation. The State also presented the testimony of Rinaldo Guevara, who stated that he had known the defendant for five years and that the defendant is a "hardcore" member of the Latin Brothers street gang. Louis Rosero testified that on August 5, 1984, the defendant stopped him on the street and asked if he would accept a set of tires in lieu of payment for a debt the defendant owed him. The defendant told Rosero to meet him in an alley in back of his father's house. When he arrived, the defendant shot him in the chest five times and twice in the back. As a result, Rosero was rendered a paraplegic and is permanently confined to a wheelchair.

In mitigation, the defendant presented several witnesses who testified to his accomplishments as a high school swimmer and diver. Several witnesses testified to the defendant's good conduct while in custody awaiting trial and his

willingness to counsel other inmates.  The defendant testified that his life should
be spared because he could be of great help to young people coming from "the
streets" as he did.  The jury found that there were no mitigating factors sufficient
to preclude imposition of the death penalty, and the defendant was sentenced to
death.

*People v. Flores*, 538 N.E.2d 481, 483-85 (Ill. 1989) ("*Flores I*").

After trial, petitioner's trial counsel withdrew and petitioner retained Julius Echeles, who

handled the post-conviction petition and direct appeal.  After a lengthy hearing, the trial court

denied the post-conviction petition.  The appeal from this denial was consolidated with the

pending direct appeal.  The Illinois Supreme Court affirmed the conviction and the denial of the

post-conviction petition in *Flores I.*  Echeles then withdrew and a public defender was

appointed.  He filed a second post-conviction petition, which was dismissed by the trial court.

This dismissal was affirmed by the Illinois Supreme Court in *People v. Flores*, 606 N.E.2d 1078

(Ill. 1992) ("*Flores II*").  Petitioner then retained new counsel to represent him in the current

habeas petition.

## DISCUSSION

In this Court's earlier review of the petition, before Governor Ryan's commutation

decision was issued, we had identified three claims that stood out as stronger than the others and

were therefore deserving of greater analysis than the rest.

The first one was the claim that petitioner's trial counsel had a conflict of interest when

he cross-examined Sammy Ramos due to the fact that Ramos was a former client.  The second

one was really three related claims that all rested on the assertion that petitioner should not have

been eligible for the death penalty because the armed robbery, which made him death eligible,

allegedly was only an afterthought made after the victim had already been killed.  Or, to describe

this argument in the more blunt phrasing of petitioner's post-conviction counsel, "you can't rob a

dead man." (PCR 515.)[1] The third one was the claim that counsel inexplicably failed to prepare

for and challenge the key piece of evidence that was used against him in the death penalty

hearing. This latter claim was petitioner's strongest claim of all.

Petitioner's decision now to proceed only with his trial-error claims means that the

second and third arguments need not be addressed. Therefore, our primary focus will be on the

first argument set forth above and then we will address the other remaining claims more briefly.[2]

## I.      Trial Counsel's Failure To Aggressively Cross-Examine Sammy Ramos.

Sammy Ramos was one of the State's three key witnesses. The other two were Nancy

LeBron who saw the initial traffic accident and identified petitioner as the person who pulled a

shotgun out of the car and Victor Flores who allegedly witnessed the murder in the nearby alley

and who decided to cooperate with the State a few months before trial. The murder took place

on January 1, 1984, but the investigation of the case did not break open until early November

1984.

At that time, Ramos testified before the grand jury that he had a conversation with

petitioner a week after the murder in which petitioner admitted he shot Perez in the face with a

shotgun. It is fair to say that this grand jury testimony was damaging to petitioner's case as it

amounted to an indirect confession of the crime, although as we discuss below it was not the

_____

[1]PCR refers to the post conviction record and R refers to the trial record.

[2]This case is not governed by the Antiterrorism and Effective Death Penalty Act, and so
we will "presume correct the state court's determination of historical factual issues" and will
"review *de novo* questions of law or mixed questions of law and fact considered by state courts."
*Wright v. Walls*, 288 F.3d 937, 941-42 (7th Cir. 2002).

only (or even most important) piece of evidence. At trial, over nine months later, Ramos was a reluctant witness. He would not reaffirm his grand jury testimony but instead claimed memory loss. The grand jury testimony nonetheless came in as substantive evidence under an Illinois statute that had recently been enacted to deal with the problem of the turncoat witness who recants his grand jury testimony at trial.

Petitioner complains that his trial counsel (Michael Johnson) conducted a tepid cross-examination of Ramos, failed to blunt the obvious damage from the grand jury testimony, and ignored a "sizeable arsenal" of impeachment evidence. According to petitioner, any competent counsel in this situation would have argued that Ramos lied to the grand jury when he implicated petitioner. There are three specific arguments along this line that could have been made but (according to petitioner) were not developed. First, several days before Ramos testified before the grand jury, he was arrested for the Perez murder and thus could have implicated petitioner in order to divert attention from himself. Second, at the time of his grand jury testimony, Ramos had several pending felony charges and thus may have testified the way he did either because he had struck a deal with the state or because he hoped to do so in the future. Third, by the time of trial, Ramos had been convicted of numerous felonies and therefore lacked credibility as a witness.

Not only did counsel fail to develop these arguments, he also (according to petitioner) committed two affirmative mistakes when he had Ramos on cross-examination "confirm" two prejudicial points from his grand jury testimony. First, he asked Ramos about whether petitioner was a member of the Latin Brothers street gang. This testimony was allegedly damaging because, among other things, petitioner testified at the death penalty portion of the trial that,

although he was friendly with this gang purely out of concern for his safety, he was not actually a member and instead was a student and successful athlete. Second, counsel asked Ramos on cross whether he believed petitioner's statement that he had killed Perez. Although Ramos said that he did not believe that petitioner would have done such a thing, the effect of this line of questioning (again, according to petitioner's argument) was that Ramos indirectly confirmed on cross-examination the key point of the grand jury testimony – that petitioner in fact did have a conversation with Ramos a week after the crime in which he admitted shooting Perez.

Petitioner believes there is an explanation for counsel's allegedly defective cross-examination. He alleges that counsel was trying to protect Ramos, his former client, from possible perjury charges. Therefore, rather than take the obvious approach of trying to suggest that Ramos had lied to the grand jury, counsel instead fashioned a compromise strategy whereby he had Ramos confirm the truth of his grand jury testimony but then attempted to have Ramos mitigate the damage to petitioner by opining that he did not believe this testimony. Petitioner claims that counsel was trying to "rehabilitate" Ramos and to "insulate him from any possible charge of perjury."

Petitioner thus claims that the flawed cross-examination was not simply a case of bad lawyering but was instead was a conscious strategy motivated by an actual conflict of interest. At least this is the argument set forth in Count I. The parties agree that this claim should be evaluated under the two-part test set forth in *Cuyler v. Sullivan*, 446 U.S. 335 (1980). Under *Cuyler*, petitioner must show that counsel operated under (i) an actual conflict that (ii) adversely affected his performance. *Id.* at 348.

Petitioner also has a backup claim in Count IV, which is a traditional ineffective assistance claim under the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 685-96 (1984). This claim does not rest on any assertion that counsel's mistakes were caused by a conflict. Under the *Strickland* test, petitioner must show that counsel's performance fell below an objective standard of reasonableness and that it resulted in prejudice. This test, unlike the *Cuyler* test, does not require petitioner to come up with a reason for *why* counsel performed inadequately.

As many courts have noted, a defendant has an incentive to categorize his claim under *Cuyler* rather than *Strickland.* The *Cuyler* test imposes a "somewhat lighter burden" with regard to the prejudice requirement. *Cabello v. United States*, 188 F.3d 871 (7th Cir. 1999). The defendant need only show that the conflict had an "adverse effect" on counsel's performance but is not required to show *Strickland* prejudice, a more difficult undertaking which requires the defendant to show that the result probably would have been different but for the errors of counsel. The reason for this lesser burden is that the duty of loyalty is one of the "most basic" duties of counsel, and "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, 466 U.S. at 692. Although *Cuyler* allows the defendant to avoid the more onerous prejudice requirement, it does impose its own initial requirement. The defendant must show that his counsel operated under an actual (as opposed to a possible) conflict of interest. This requirement has often been a stumbling block for defendants.

Consistent with the emphasis given by petitioner in his briefs, we will devote more time to analyzing the *Cuyler* claim and will turn to the *Strickland* claim thereafter. As described

above, petitioner is alleging that counsel tailored the cross-examination around his concern for protecting Ramos from perjury. This is a strong allegation carrying with it the charge that counsel compromised his current client's defense to a capital murder charge to protect a former client from a possible future prosecution for perjury. Without even getting into the case law, which is complex and not always clear, we are confident in stating as an initial proposition that, if it is true that counsel was trying to protect Ramos in this manner, then counsel was operating under an actual conflict of interest. The more difficult question, however, is the factual one of whether counsel was truly motivated by this concern. The burden of proof lies with petitioner as he must overcome a "strong presumption" that counsel was effective. *United States v. Pergler*, 233 F.3d 1005, 1008-09 (7th Cir. 2001).

Before analyzing petitioner's specific arguments, it will be helpful to first sketch out some of the possible ways a defendant might go about establishing an actual conflict. At its most basic level, a conflict of interest means the attorney had "divided loyalties"of some sort – usually between two clients and less often between a client and the attorney's personal interests. By definition, loyalty is in part a subjective psychological state. So, one obvious way of showing that counsel had conflicting loyalties is to get a direct admission from counsel. As the Supreme Court stated in *Holloway v. Arkansas*, 435 U.S. 475 (1978), an attorney is usually in the "best position" to know when a conflict exists or might develop, and such admissions carry great weight particularly when made at the time of trial. *Id.* at 485. Admissions made after trial are more suspect for obvious reasons.

Another way to prove a conflict existed is to draw inferences from the way the attorney performed at trial. This approach has the virtue of avoiding the need to get a direct admission

from counsel but it suffers from the problem that there are many other reasons why an attorney's performance might have been sub-par, ranging from failed trial strategies to garden-variety attorney incompetence. For this reason, to prevail under this method of proof and to overcome the strong presumption of competence, a defendant typically must show that the *only* plausible inference was that the attorney's performance was caused by a conflict of interest. *See, e.g., Pergler*, 233 F.3d at 1011 (7th Cir. 2001) (because the record is "not clear," "[w]e will not guess at defense counsel's reasons for structuring [the] cross-examination as they did").

The conflicts question also can be analyzed from a more objective and less fact-specific angle by looking at whether a particular "situation" is likely to create a conflict. *See Perillo v. Johnson*, 205 F.3d 775, 801 (5th Cir. 2000) (an actual conflict arises when an attorney is placed "in a situation" that is "inherently conducive to divided loyalties"). To cite a classic example, an attorney would be in conflict if she represented two co-defendants in the same trial where each was trying to implicate the other. In this type of a case, there is no need to delve into the attorney's subjective state of mind because any attorney in this situation would be under a conflict.

The conflicts case law focuses heavily on this situational approach as courts have developed various legal presumptions and factual generalizations applicable to frequently recurring situations. And, in some situations, courts have concluded that a particular situation is so likely to create an actual conflict that it is reasonable to assume that a conflict existed without requiring further individualized proof. The Supreme Court's decision in *Mickens v. Taylor*, 122 S.Ct. 1237, 1264-65 (2002) contains much discussion regarding the relative merits of a categorical rule versus a case-by-case approach.

We mention these approaches because petitioner essentially relies on all three of them. First, he asserts that counsel made statements at the post-conviction hearing that are tantamount to an admission that he had a conflict. Second, in his primary argument, he asserts that the only plausible explanation for the defective cross-examination is that counsel was trying to protect his former client from perjury. Third, he argues that the situation was inherently filled with conflict because counsel had to cross-examine a former client who testified before the grand jury at the same time he was being represented by counsel or his partner.

We will address the third argument first as it is the one most closely aligned with the case law. The question of whether an actual conflict arises when an attorney cross-examines a former client has arisen often. Although the Supreme Court has not definitely addressed this issue, the appellate courts have considered it on numerous occasions. These courts, though differing somewhat in their approaches, have all rejected the argument that an actual conflict arises *automatically* based on "mere proof" that the attorney cross-examined her former client. *See, e.g., Smith v. White*, 815 F.2d 1401, 1405 (11th Cir. 1987). Instead, "something more" is needed. *Perillo*, 205 F.3d at 802. Although this conclusion may seem counterintuitive to the layperson, it is based on attorney ethical rules, which hold that an attorney generally does not owe a former client any duty of loyalty. Once the representation ends, the attorney is free to represent other clients with interests adverse to the former client, subject only to the duty to protect client confidences.

The Seventh Circuit's decision in *Enoch v. Gramley*, 70 F.3d 1490 (7th Cir. 1995) reflects this skepticism regarding cases of successive representation as opposed to cases of concurrent representation. Specifically, in *Enoch*, the Seventh Circuit adopted the two-part

threshold test set out by the Eleventh Circuit in *Smith v. White*, 815 F.2d 1401 (11th Cir. 1987). This test, as summarized below, focuses on the possible receipt of confidential information:

> [M]ere proof that a criminal defendant's counsel previously represented a witness is insufficient to establish [an actual conflict]. In such a context, if defendant fails to show that either (1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case, then defendant has not come even close to showing [an actual conflict].

*Id.* at 1405-06. As later explained by the Eleventh Circuit in *Freund v. Butterworth*, 165 F.3d 839, 859-860 (11th Cir. 1999), this test is based on the assumption that the only valid concern in this situation is the possible effect of confidential information. If an attorney received confidential information from a former client that was relevant to the later cross-examination of that client, the attorney may be reluctant to use that information out of a fear of violating his ethical duty to protect the former client's confidences. The second part of the test directly asks whether the attorney "actually" learned "particular" confidential information that would be relevant to the later case. *Id.* at 859. The first part approaches the question indirectly, asking whether the earlier representation was "substantially and particularly related" to the later representation, the presumption being in such a situation that the former client "divulged to the lawyer [] all of his or her confidences relevant to the subject of the representation." *Id.* at 859-60.

It is important to keep in mind that this test does not provide a final answer to the conflicts question. As the Eleventh Circuit stated in *Smith*, and subsequently reaffirmed in *Freund*, the two-part test is merely the beginning of the analysis:

> We do not imply that proof of either substantial relationship or receipt of relevant confidential information or both would be enough to demonstrate [an actual conflict] in a successive representation case.

*Smith*, 815 F.2d at 1406; *Freund*, 165 F.3d at 859. Ultimately, if a petitioner meets this test, the question then becomes a "fact-specific" one with the "ultimate burden" resting on the petitioner. *Id.* Thus, it is possible that a petitioner will meet both parts of the test but still not satisfy his burden of establishing a conflict.

The Seventh Circuit adopted and applied this two-part test in *Enoch* and found that no conflict existed. The facts are instructive. The defendant, who had been convicted of capital murder, alleged in a habeas petition that his lawyer at trial had a *Cuyler* conflict of interest because he previously represented a key prosecution witness. Like petitioner here, the defendant argued that this conflict prevented his lawyer from "vigorously cross-examining [this witness] about his past crimes in order to impeach his credibility." The defendant also argued that the conflict prevented his lawyer from suggesting to the jury that this witness was "the only other suspect in the crime." 70 F.3d at 1496.

The Seventh Circuit found that no conflict existed and affirmed the district court's denial of the habeas petition. In applying the two-part test from *Smith*, the Seventh Circuit first concluded that the attorney's earlier representation of the witness was not related factually or temporally. The attorney represented the witness on "entirely separate crimes" that took place four years earlier, and there were no "cross-cutting relationships" between the two cases. *Id.* at 1497. The court next concluded that Enoch had not pointed to any "particular confidences" that his attorney learned during the prior representation. *Id.* at 1498. Because Enoch had not met

either part of the test, his claim was rejected.  In its discussion, the Seventh Circuit emphasized that an attorney does not have a "general duty" to protect his former client's "interests."  *Id.*

Not surprisingly, the State relies heavily on *Enoch* and argues that petitioner has failed to meet either part of the test and that his claim is therefore doomed from the start such that we need not look any further at the facts.  Petitioner responds with several arguments.  He first questions whether this case should even be classified as a successive representation case given that there was a period of overlapping representation during part of the pretrial phase of his case.  Even if *Enoch* applies, petitioner thinks that he should get an evidentiary hearing so that he can try to elicit evidence that counsel informally advised Ramos on his grand jury testimony.  Petitioner finally argues that the better approach is to simply evaluate all of the relevant facts and come to a common sense conclusion about whether an actual conflict existed.  Essentially, he is asking that we follow the approach used by the Fifth Circuit, which refused to adopt the *Enoch* threshold test.  *See Perillo*, 205 F.3d at 798-99.

Although it is a close question whether petitioner can meet the threshold test in *Enoch*, we find that it makes sense to proceed under the assumption that he can meet this test.  First, the facts here are closer than those considered by the Seventh Circuit.  In contrast to *Enoch*, where counsel represented the witness four years before trial, counsel or one of his associates represented the witness (albeit on an unrelated case) at the same time he testified before the grand jury in November 1984.  In fact, counsel and his associate were in the middle of a criminal trial with Ramos on the very day he testified before the grand jury.  This raises a question whether counsel may have informally advised Ramos about his grand jury testimony.  If counsel did advise Ramos, then the two cases would be "substantially related" under *Enoch* and also

under *United States v. Malpiedi*, 62 F.3d 465 (2d Cir. 1995). Petitioner concedes, however, that he does not currently have any evidence of such informal consultation but claims that there is enough suspicion to warrant an evidentiary hearing.[3]

Second, in addition to petitioner's claim that counsel could have informally advised Ramos about his grand jury testimony, petitioner also complains that counsel represented Ramos (again, on unrelated felony charges) from around December 4, 1984 up until April 22, 1985. During this same period, counsel may have been working on petitioner's defense to the Perez murder.[4] Petitioner thinks that it strains credibility to believe that counsel did not talk to Ramos about his grand jury testimony during this time. Although petitioner again has no direct evidence, he believes that this period of contemporaneous representation raises suspicion.

---

[3]We should make clear that, on the current record, we can find no concrete evidence to suggest that counsel did in fact consult with Ramos. Counsel was questioned at length at the post-conviction hearing and never once suggested that he advised Ramos about his grand jury testimony. In the related *Gomez* case, counsel testified that, "at the time, he had not known that Ramos had gone before the grand jury" and that he "found out about it several months later." *Gomez v. Ahitow*, 29 F.3d 1128, 1135 (1994). Counsel also stated that he was actually representing one of Ramos' co-defendants in the trial that was taking place. *Id.* at n.5. In his habeas petition, petitioner alleged that counsel knew about the Ramos grand jury testimony "because" it had been tendered to him later in discovery. (Pet. ¶ 79.) Petitioner also testified at the post-conviction hearing that counsel did not represent him until Gilman died, which occurred in January 1985, well after the grand jury testimony. (PCR 181-82.) These facts all suggest that counsel did not advise him about the grand jury testimony. Given that these issues were addressed extensively in the lengthy post-conviction hearing, it is hard to see how another evidentiary hearing would bring out any more evidence favorable to petitioner on this question.

[4]It is undisputed, however, that counsel's representation of Ramos ended in April 1985 -- several months before the Perez trial. The evidence is unclear whether counsel actually did any preparation before April. In the post-conviction hearing, counsel stated that, until Victor decided a few months before trial that he would cooperate, he did not believe that the State had a very strong case.

Third, *Enoch*, like a lot of conflict cases, approached the conflicts question from an objective angle, asking whether a particular situation created a conflict. The Seventh Circuit stated that, aside from a concern about confidential information, there is no basis for *assuming* that counsel would "pull punches" in cross-examining a former client. Here, petitioner is relying on more than the mere fact that counsel cross-examined his former client. He claims that he has other proof (attorney admissions and inferences from the specific way counsel performed) showing that counsel was operating under a conflict. This is more of a subjective argument focusing on what was going on in the mind of this particular counsel and does not rely solely on the situation faced by counsel. Stated differently, the fact that counsel did not have an ethical duty to protect a former client does not necessarily rule out the possibility that he nonetheless was trying to do just that. Among other things, he could have developed a personal friendship with his former client or could have mistakenly believed he had an ethical duty to protect his interests. Finally, by giving petitioner the benefit of the doubt and assuming that he can meet this threshold test, we are not deciding the ultimate issue because petitioner is still required to present additional evidence to show that there was an actual conflict. Therefore, we are merely giving petitioner a chance to present all of his evidence while at the same time giving the appellate court the benefit of a complete record.

There is still one important principle from *Enoch* worth keeping in mind. The Seventh Circuit was clear that an attorney has no general duty to protect his former client's interests. This holding thus makes it clear that counsel had no ethical constraints that would have prevented him from putting his former client at risk for perjury. In *Enoch*, the Seventh Circuit stated that an attorney even could suggest that his former client committed the murder for which

his current client was charged. If counsel is not prohibited from suggesting that his former client committed murder, then it should follow that he is also not prohibited from suggesting that his former client perjured himself. Based on this principle and on the fact that petitioner has not yet pointed to any specific confidential information counsel obtained through his representation of Ramos, we do not find that the period of overlapping representation, by itself, proves that a conflict existed or even provides strong evidence.

We therefore proceed to petitioner's other two main arguments, beginning with the supposed admission of counsel. An attorney's admission that a conflict existed, if it is clear and explicit, is the type of direct evidence that might overcome the strong presumption that counsel was competent. *See, e.g., Reynolds v. Chapman*, 253 F.3d 1337, 1347 (11th Cir. 2001) (attorney "even admitted that, 'looking back on it,' he may have had a conflict of interest").

In this case, petitioner does not have an explicit admission but is instead claiming that counsel *implicitly* admitted in the post-conviction hearing that he had a conflict. After reviewing the transcript, we are not persuaded that counsel even made an implicit admission. Petitioner's argument is a creative attempt to extract an admission from a couple of vague statements made at a contentious post-conviction hearing. *See Chandler v. United States*, 218 F.3d 1305, 1315 n.15 (11th Cir. 2000) ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption" that counsel's performance was reasonable.).

When asked what his strategy was regarding Ramos, counsel began his answer by stating that "Sammy Ramos at one time was a client of mine" and then proceeded to describe how Ramos had been given immunity at trial but couldn't remember any of his answers from his grand jury testimony and how the State sought to use the testimony as substantive evidence

under the recently-enacted statute.  Petitioner's post-conviction counsel then began asking other

questions (it is not clear whether he interrupted counsel or whether counsel had finished his

answer) about the Illinois statute and about the details of counsel's representation of Ramos.

Relying on this exchange of testimony, contained at page 354 of the post-hearing transcript,

petitioner claims that counsel "all but admitted" that he had a conflict.  The basis for  this

conclusion is the claim that counsel's initial statement that he previously represented Ramos was

akin to a Freudian slip in which counsel inadvertently revealed the conflict.  It is important to

make clear, of course, that counsel never stated directly that he had a conflict.  Petitioner

believes, however, that the inadvertent reference to Ramos should be viewed in combination

with the fact that counsel failed to go on and articulate *any* cross-examination strategy with

Ramos and then further combined with the fact that counsel gave an explanation of his strategy

for cross-examining Lebron and Victor Flores.[5]  Although we agree that one possible indicator of

a conflict of interest relating to Ramos would be an unexplained dip in counsel's performance

with Ramos as compared to his performance with other witnesses, we are not persuaded that

counsel's performance was inconsistent.[6]

---

[5]To avoid confusion with petitioner, who has the same last name, we will refer to Victor Flores by his first name.

[6]In evaluating counsel's performance, as well as his testimony at the post-conviction hearing, we note that at the time of this trial he had been practicing as a lawyer for a little over three years and had participated in at least a dozen murder trials and had handled five or six murder jury trials by himself.  (PCR 384-85.)  At the same time, the original plan had been for counsel to try this case with Gilman, who was more experienced and who "usually took the lead" and "usually did most of the examination" when the two worked together.  (PCR 386.)  But this plan fell through when Gilman died and counsel then was forced to try this case by himself against two prosecutors.

It is true that counsel did not give a description of his cross-examination strategy during this particular exchange at the post-conviction hearing. But it is far from clear that this was because he did not have a strategy or because he was hiding an illicit strategy of trying to protect his former client. For one thing, the testimony is ambiguous in that it appears that counsel was beginning to give an answer but then petitioner's post-counsel began to ask peripheral questions, causing the conversation to veer off, after which post-conviction counsel never returned to the original question at hand and directly asked counsel about his strategy. For another thing, the hearing was contentious and counsel was being aggressively questioned about all aspects of his performance and in a number of places gave vague or tentative answers and seemed uncomfortable with the process. Contrary to petitioner's suggestion that he gave detailed descriptions of his cross-examination strategy of Victor and Lebron, these answers are also terse and vague. With regard to Victor, counsel explained that his strategy was "to go to [Victor's] credibility, try to somehow impeach his credibility." (PCR 353.) Counsel's halting answers are ultimately weak evidence for the proposition that he was hiding a conflict of interest as it is equally reasonable to assume that they reflect a sense of guilt that any attorney, especially a younger one, might have after losing a trial and having his client sentenced to death.

Rather than trying to decipher counsel's cryptic answers during the post-conviction hearing, we think it is more productive to simply turn to petitioner's most-developed argument, which is the assertion that the *only* rational explanation for counsel's performance cross-examining Ramos is that he was pursuing this conflict-driven strategy. *See Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir. 1994) ("The existence of an actual conflict cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to

discern whether the attorney's behavior seems to have been influenced by the suggested conflict."). Petitioner's argument, as described above, rests on the claim that counsel omitted three good arguments and needlessly allowed two bad points to come out.

To assess these arguments, we need to describe the testimony in more detail. Ramos was called as a witness in the middle of the State's case. Before he testified, the prosecutor indicated that there was a question as to whether Ramos was going to assert his Fifth Amendment privilege. (R 310.) At that point, defense counsel informed the court about his prior representation of the witness:

> I have represented Sammy Ramos previously. His father contacted me when he learned he was coming back here. He was brought to your courtroom about a week or so ago, at which time he asked to speak to me, and he told me that he doesn't want to testify.

> I told him that being Mario's attorney, I would have a conflict in consulting with him. So, my recommendation would be – I believe there is a reluctance on his part to testify.

> I have talked to his wife, and I talked to his father. I think that, maybe, it would be best if we had a public defender or something here, if we could summon one here to consult with him to testify or let him know what his rights are.

(R 310-11.)

The trial judge eventually appointed a public defender to represent Ramos and recessed the trial overnight so that Ramos could confer with his attorney. The next day the state granted him immunity. Before Ramos testified, the trial judge explained to him that the grant of immunity would not protect him from perjury: "if you commit perjury, they can indict you for that." (R 318.)

On direct, the prosecutor first asked Ramos whether he remembered having a conversation with petitioner in January of 1984 concerning the murder of Gilbert Perez. Ramos

answered: "I don't remember." (R 322.) The prosecutor then asked Ramos about his grand jury testimony, and Ramos said he remembered going to the grand jury but could not remember what he testified to. The prosecutor then read through the grand jury testimony, and Ramos continued to state that he had no memory of either the testimony or the alleged conversation with petitioner.

Through this questioning, the jury learned that Ramos had testified that petitioner admitted a week after the crime that he was the one who had shot Perez and that he had shot him six times in the face. Petitioner also allegedly admitted that Harry Gomez removed some jewelry from Perez as they were leaving the scene. This fact was important because it helped to establish the armed robbery, which made petitioner eligible for the death penalty. The grand jury testimony came in as substantive evidence, despite Ramos' memory lapse, under the provisions of a recently enacted Illinois statute.

On cross-examination, counsel questioned Ramos about a number of topics. He first tried several times to ask Ramos whether he remembered testifying before the grand jury. When Ramos continued to answer no, counsel moved on to the following two questions:

> Q.    And you also recall that a few days prior to [your grand jury testimony], you were arrested by Chicago police officers?
>
> A.    Yes.
>
> Q.    And the police officers arrested you and told you they were investigating a homicide that happened back on New Year's Eve of 1984?
>
> A.    Yes.

(R 335.)

Counsel then asked a series of questions about Ramos' relationship to petitioner and Victor Flores. Ramos testified that he had known both men for "many years" and that they both belonged to the same street gang (Latin Brothers) in which Ramos was also a member. (*Id.*) Ramos further testified that he had a number of conversations with both men during the same general time as the alleged conversation described in his grand jury testimony.

Counsel next asked about gang hand signals, following up on a theme he had already developed in his cross-examination of earlier prosecution witnesses. Counsel showed Ramos several pictures of an individual holding three fingers pointed downwards – known as "throwing the pitchfork down." Ramos explained that this particular hand signal meant that the individual was a "Disciple killer." (R 339-40.) Counsel then asked Ramos to identify the individual making this sign. Ramos said the man was Victor Flores. Counsel ended the cross-examination by asking Ramos about whether he "believed" petitioner's alleged confession to the murder.

After reviewing this testimony in light of all the surrounding factors, we are not convinced that the supposed errors of counsel were the product of a conflict of interest. More likely, when they are viewed in the larger context of the trial, they were either strategic choices or attorney mistakes that had nothing to do with a conflict.

A few general points to begin with. First, other than the fact that Ramos was a former client, there is no other evidence suggesting that counsel had any motivation to protect him from perjury charges. For example, there is no evidence of a special bond or friendship between the two men. *Cf. Caban v. United States*, 281 F.3d 778, 785-86 (8th Cir. 2002) (attorney stated that he "did not want to subject his friend to an embarrassing cross-examination"). At the time of trial, Ramos was in jail beginning a ten-year sentence (Pet. ¶ 92), making it unlikely that counsel

was trying to curry favor with him in the hopes of getting future business. On the other hand, counsel was then representing petitioner's sisters, Anna and Grace, in civil litigation. (PCR 363.) Thus, if anything, it is more likely that counsel would have had more incentive to favor petitioner's interests in the event of a conflict.

Second, along a similar line, the evidence suggests that both petitioner and counsel may have believed that counsel's prior relationship to Ramos would be helpful. At the post-conviction hearing, petitioner described how he and his family became concerned shortly before trial that counsel was not doing a good job in preparing for trial and they considered switching attorneys and even interviewed several prominent defense attorneys. Ultimately, they decided to stay with counsel. At the post-conviction hearing, petitioner explained why:

> [Johnson] said that he would be the best attorney for my case because he was also representing Mr. Sammy Ramos and also Harry Gomez who were also going to be called as state witnesses in my case. He told me that was the best situation that he was in. You know so my family we agreed to stay with him, I guess.

(PCR 221-22.) This statement suggests that counsel anticipated that Ramos would be more inclined to give favorable testimony if he was cross-examined by counsel. And, as it turned out, Ramos was cooperative on cross-examination, a point the prosecutor made in his closing argument in trying to undermine Ramos' testimony: "[h]is memory got a lot better when Mr. Johnson got up [on cross-examination] and started asking him questions." (R 469.)

Third, even if counsel was worried initially that his former client might be subject to perjury charges, his concern should have been alleviated when the trial judge appointed a public defender to advise Ramos. Counsel knew that the public defender would warn Ramos about the risks of perjury should he disavow his grand jury testimony on the stand – just as the trial judge warned him in open court. The fact that defense counsel asked the court to appoint separate

counsel suggests that he was planning on conducting an aggressive cross-examination and also that he was aware of his ethical duties.

Fourth, in his closing argument, counsel repeatedly argued that Ramos was liar whose story should not be believed. *See* R 494 ("[Ramos] isn't half a liar. If he's lying; he's lying, and you can't believe him."); R 499 ("You judge the credibility of the witnesses. [] If you half believe Sammy Ramos, those are reasonable doubts."); *id.* ("The interest that Victor Flores has to lie is the rest of his life. Victor Flores has the rest of his life. Sammy Ramos has the rest of his life. What does Mario have?"). These statements show that counsel was not afraid of making his former client look bad in front of the jury and was not worried about calling him a liar. Perhaps, petitioner now wishes that counsel had been more eloquent in making this point, but this criticism is one about the execution of a valid strategy and does not establish that a hidden conflict of interest was the underlying problem.

In addition to these points, all of which suggest counsel did not have any conflict, we must not lose sight of the larger picture. Counsel was facing an uphill battle with regard to Ramos. As the Illinois Supreme Court noted, "there is very little defense counsel could have cross-examined the witness upon which would have been favorable to the defendant." *Flores I*, 538 N.E.2d at 487-88. The Illinois statute in question allowed the prosecution to introduce Ramos' grand jury testimony as substantive evidence even if he completely recanted that testimony on cross-examination. Therefore, counsel had no viable way of keeping the grand jury testimony from coming into evidence. *Cf. Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001). Moreover, Ramos testified on direct that he did not remember his grand jury testimony, making it difficult for counsel to question him about the circumstances surrounding that testimony. For

this reason, petitioner argued in his direct appeal to the Illinois Supreme Court that the grand jury testimony should not have been allowed into evidence because memory loss made it *impossible* for counsel to *effectively* cross-examine the witness – a theory that is at directly odds with his current assertion that a conflict of interest was the reason for the allegedly ineffective cross-examination. *Flores I*, 538 N.E.2d at 489. Looking more broadly at all the evidence, we must also remember that counsel was fighting a multi-front battle because he had to deal with the testimony of Lebron and Victor in addition to that of Ramos.

With these points in mind, we now turn to the specific criticisms raised by petitioner, beginning with the three alleged omissions. Again, the relevant inquiry at this point is not whether counsel conducted a perfect cross-examination, which he clearly did not do, but whether the particular way in which he conducted that examination provides indirect evidence that he was operating under a conflict of interest.

First, petitioner faults counsel for failing to bring out that Ramos had been arrested for Perez murder several days before his grand jury testimony and that Ramos therefore may have lied to take suspicion away from himself. As an initial matter, counsel did ask Ramos at the beginning of the cross-examination about the fact that he had been arrested "a few days" before his testimony. (R 335.) So it is not accurate to say that he ignored the argument. Petitioner may be upset that counsel did not further develop this argument and did not mention it in closing. Even so, the fact that counsel set up the point on cross shows that he was not afraid to make it and instead suggests that the failure was one of execution (he forgot to bring it up in closing) or trial strategy (he thought it did not play well with the jury). In addition, this argument is not as straightforward as it might seem. Ramos was initially a suspect in the crime when Nancy Lebron

-27-

tentatively picked out his picture from the gang photo book on the Friday night in November. The next night, however, she failed to pick him out of a lineup. Thus, at the time of his grand jury testimony on Tuesday, Ramos was no longer a suspect. Moreover, we are not aware of any other evidence either existing at that time or developed later that links Ramos to this crime.

Second, petitioner faults counsel for failing to explore any agreement, promise of, or hope for leniency Ramos may have had when he testified before the grand jury. Petitioner says that Ramos received a "very lenient" sentence on the three unrelated felony charges for armed robbery that were then pending. (Ramos plead guilty and received a ten-year concurrent sentence; petitioner asserts that the maximum concurrent sentence was 30 years.) But petitioner has not provided any facts about the nature of those charges, and so we cannot know for sure why Ramos received a lesser sentence than the maximum. There is also no concrete evidence in the record that Ramos had a deal with the State. As noted previously, things moved quickly. Ramos was arrested on a Friday night, gave a court-reported statement (without counsel present) the next night, and testified to the grand jury on Tuesday. Moreover, if Ramos was trying to curry favor with the prosecution, he certainly was not so inclined at trial when he testified that he had no recollection of petitioner ever confessing to the crime. While it still may have been reasonable for counsel to suggest that Ramos lied to the grand jury in the hope of getting a deal, it does not follow that counsel's failure in this respect was due to a concern over protecting Ramos from a perjury charge.

Third, petitioner faults counsel for not bringing to the jury's attention the fact that Ramos had been convicted of numerous felonies, thereby suggesting that he had a propensity to lie. Once again, as an initial matter, counsel did bring this point out to some degree when he stated in

closing that Ramos was in prison. *See* R 495 ( "I'd give you a chair for Sammy Ramos, but he's already back down in the joint. He doesn't need a chair."). It is true that counsel could have made this fact more explicit. But asking Ramos on cross-examination whether he was a convicted felon would not have subjected him to a risk of being prosecuted for perjury.[7] In fact, this point applies to all three arguments. To suggest on cross-examination that a witness in a criminal trial had a motive to lie to the grand jury has little impact on whether that witness would later be prosecuted for perjury.

Now to the two allegedly prejudicial points — testimony that petitioner was a gang member and that he did have a conversation a week after the crime. Petitioner argues that counsel purposefully had Ramos testify about these two points as part of an effort to "confirm" his grand jury testimony. As a general point, even if counsel was worried about his former client's exposure to perjury, it is unclear how it would allay his fears to have the witness confirm these two particular points from his grand jury testimony. In particular, why bring out the part about gang membership?

A better explanation exists. Contrary to petitioner's earlier suggestion that counsel had no plan of attack for his cross-examination, it is clear from a reading of the entire transcript that counsel in fact did have a broader trial strategy, one that provides an explanation for the questions that were asked. This strategy was to suggest that Victor was the "real killer." From the beginning of the trial, counsel sought to focus the jury's attention on Victor, who was at the scene of the crime but allegedly was looking away when the shots were fired and who began

---

[7]It was also a matter of public record and not something that would be considered confidential information.

cooperating with the State shortly before trial. Counsel raised this theme in his opening statement, telling the jury to look carefully at everything Victor would say and ask "why" he would say it. (R 206.) Counsel's cross-examination of Detective Guevara also furthered this point. And the Ramos cross-examination also focused on Victor.[8]

The two allegedly prejudicial points in the Ramos cross-examination came out in a series of questions that were designed to establish this theme. As summarized above, counsel first asked Ramos about his relationship to Victor and petitioner and brought out that Ramos had many conversations with both men after the murder. Counsel then had Ramos explain gang hand signals and identify Victor as the man in several pictures "throwing down the pitchfork," the suggestion being that Victor was known as a killer. Counsel finally ended the cross-examination by asserting that he had known petitioner for many years and did not believe that he

---

[8]The genesis for this theory could have come from counsel's conversations with petitioner. At the post-conviction hearing, counsel was asked whether petitioner ever made any admissions before trial. Counsel initially claimed that he could not remember his pre-trial conversations with petitioner, but then the Judge told counsel to think more carefully about his answers because the Judge felt that counsel was "being less than completely candid with this court[.]" (PCR 365, 369.) When counsel returned at a later date, he was able to describe these conversations in more detail. In particular, counsel testified that petitioner gave conflicting explanations about what happened:

> There were many different versions. I had conversations where Mario denied being there. I had conversations where Mario said he was at the accident and then left. *I had conversations where Mario admitted being present in the alley but Victor shot him.* I had conversations with Mario saying he was present and Harry [Gomez] shot him. I had conversations with Mario where he – we had all different kinds of conversations. I don't remember the specifics of it.

(PC R 379; emphasis added.) It should be noted that petitioner at the post-conviction hearing denied making these admissions.

would have killed Perez. It is apparent from this line of questioning that counsel was using Ramos, a man who knew both men, to suggest that Victor was the more likely suspect.

While this strategy was undoubtedly risky in some ways, it at least had a potential upside of undermining the testimony of Victor who was probably the most important witness. The prosecutor in his opening focused more attention on Victor than on Ramos. In closing, the prosecutor stated directly that Victor was "the crucial witness" in the case. (R 472.) If so, then it would not be unreasonable to make a strategic decision to use Ramos to try to undermine Victor. To do so, however, entailed some trade-offs. For one thing, counsel had to establish that Ramos had a basis for identifying Victor as a "Disciple killer" and for also saying, effectively, that he thought Victor did it. This basis was their common friendship and association through the gang.

Was this an unreasonable approach? We cannot say it was because there was already much evidence that Victor, Ramos, and petitioner were in the same gang. Lebron testified that she had looked through gang photo albums and had picked out a picture of petitioner. Detective Guevara, who was a specialist in gang crimes, said that petitioner was a member of the Latin Brothers. Ramos' grand jury testimony also included the assertion that petitioner was in the gang. With this evidence already in the record, counsel could have concluded that downside of one more reference was worth the upside of making the larger points against Victor. This strategy also would explain why counsel might not want to continually harp on the point that Ramos was a liar. Similarly, counsel might have chosen that he wanted to keep the jury's focus on Victor as the more likely suspect and so may not have wanted to confuse the jury by also then suggesting that Ramos also could have been a suspect.

While petitioner claims that these points were prejudicial, this point is not clear. The prosecutor's closing argument focused more on Victor and Lebron and did not focus extensively on Ramos. And part of the time the prosecutor spent on Ramos was on the defensive, trying to discredit Ramos' testimony that Victor was the killer. To this extent, then, the cross-examination had some effect. We are not saying that this strategy was the best one or even that it was well executed but simply that it was a plausible choice counsel could have made, which in turns means that we cannot draw the inference suggested by petitioner that the *only* explanation for counsel's performance is that he was operating under a conflict of interest.

And some of the alleged mistakes could have simply been performance errors that sometimes occur in the heat of a trial. In particular, petitioner complains that counsel had Ramos confirm on cross-examination that petitioner in fact did have a conversation with Ramos a week after the crime. The specific questions and answers were as follows:

> Q. Now, that conversation that you spoke to the grand jury about, did you believe what Mario Flores was telling you?
>
> A. No.
>
> Q. And why did you not believe what Mario Flores was telling you?
>
> A. I don't think it was possible.
>
> Q. Why it is not possible?
>
> A. He wouldn't do nothing like that.

(R 340-41.) It is a stretch to argue, as petitioner does, that counsel was intentionally trying to get petitioner to confirm his grand jury testimony. If that were the goal, then these questions would be a convoluted way to go about it. The more reasonable explanation is the simpler one – counsel was trying to ask Ramos whether he believed that petitioner had committed the murder

and simply misspoke and phrased the question in an awkward manner.  Cross-examination often does not come off the way planned by counsel.  For all the above reasons, we find that petitioner has not met his burden of demonstrating that counsel was operating under an actual conflict of interest.

The possibility still remains, however, that some or all of the alleged missteps discussed above violate the *Strickland* standard.  As noted above, one could fault counsel's cross-examination in some ways.  Among other things, he arguably could have made more of the fact that Ramos was a felon and that he was at one time a suspect in the Perez murder.  In several places, counsel introduced arguments but then did not explain them further or mention them in closing.

However, we find that it is not necessary to further explore whether these alleged errors constitute defective performance under *Strickland* because we find that petitioner cannot establish that he was prejudiced as a result of them.  Most of the reasons for this conclusion have already been set out.  First, as the Illinois Supreme Court correctly pointed out, any counsel in this situation would have had little to work with given the way the Illinois statute operated and the fact that the witness testified on direct that he could not recall his testimony.  In effect, the damage was already done.  Second, counsel did attempt to develop some of these arguments.  He brought out that Ramos was a suspect in the crime and thus had a motive to lie to the grand jury and he argued forcefully in closing that Ramos was a liar.  So the jury was generally aware of these points.  Finally, Ramos was not the most important witness for the State.  Based on closing arguments, the prosecutors focused more attention on Victor and Nancy Lebron, suggesting they had some doubts about how good a witness Ramos had been for their case.  For these and the

other reasons already mentioned, we find that petitioner has not met his burden of establishing prejudice.

## II.     The Remaining Counts.

The remaining counts are less compelling and we therefore will address them in more summary fashion.

### A.     Conflict Of Interest Relating To Harry Gomez.

In Count II, petitioner alleges that counsel had a conflict of interest because, while he represented petitioner, he allegedly was also advising Gomez about his potential prosecution for the Perez homicide. Petitioner believes that counsel had a conflict because petitioner was telling counsel that Gomez and Victor were the ones who killed Perez. We are not persuaded by this claim and agree with the reasons set forth in the State's briefs as well as the analysis of the Illinois Supreme Court. *See Flores I*, 538 N.E.2d at 499.

### B.     The State Failed To Disclose Its Agreement With Victor Flores.

In Count III, petitioner alleges that Victor denied on cross-examination that he had any deal with the State regarding his testimony. Petitioner believes this testimony was false and known to be so by the State. The State asserts that Victor did not give false testimony. Victor admitted on the stand that he was "hoping" for consideration in exchange for his testimony and there is no evidence that there was anything more concrete. The State further asserts that there was no material harm in any event because defense counsel suggested to the jury that Victor had a deal and the jury was well aware that Victor was "beholden" to the prosecution.

We again agree with the State's arguments as well as the analysis by the Illinois Supreme Court in *Flores I*, 538 N.E.2d at 490. Petitioner's main argument is that Victor's attorney

allegedly acknowledged after trial that the State had promised Victor "consideration" on his own charges in exchange for his testimony against petitioner.[9] Victor testified at trial that he was "hoping" for consideration. A prosecutor's alleged promise to give "consideration" and a witness's testimony that he was "hoping" for leniency are not that far apart. Moreover, even if there was a more explicit deal, the failure to disclose it was not material. Similar to the Seventh Circuit's conclusion in *Braun v. Powell*, 227 F.3d 908 (7th Cir. 2000), we believe that "the jury was aware that [the witness] had a specific incentive to testify favorably in the hope of" receiving some consideration. *Id.* at 921.

### C. Trial Counsel's Failure To Impeach Nancy Lebron.

In Count IV, petitioner alleges that trial counsel was ineffective by failing to impeach Nancy Lebron in various ways. The State argues that this count has been procedurally defaulted. *See Dellinger v. Bowen*, 301 F.3d 758, 764-67 (7th Cir. 2002). We agree.

Count IV consists of four allegations relating to Lebron. First, counsel failed to interview Conrado Garcia, who was listed as a potential witness in the State's answer to discovery. Garcia, who was later interviewed by petitioner's current counsel in 1994, supposedly would have contradicted key parts of Lebron's testimony. Second, counsel failed to bring out in cross-examination that Lebron had a motive to falsely implicate petitioner in the Perez homicide because members of Perez' gang believed Lebron's son was responsible for shooting Perez and were threatening his life. Third, counsel failed to challenge Lebron's testimony that she anonymously reported the license number to police within one or two days of the incident when

---

[9]Elsewhere in the petition, petitioner says that Victor's attorney stated that the State had agreed to take Victor's testimony "into account" in deciding how to proceed with the charges against him. (Pet. ¶ 113.)

the police report indicated that this report had been made two weeks after the incident.  Fourth, counsel failed to bring out the fact that Lebron's initial identification of petitioner was tentative.

Petitioner concedes that the first, second, and fourth allegations were not presented to state court due to the failure of post-conviction counsel to investigate and present them.  (Pet, ¶ 126.)  However, the alleged ineffectiveness of post-conviction counsel cannot constitute cause for the failure to raise these claims because that claim itself was also not presented to state court.  *See Dellinger*, 301 F.3d at 767.  As a result, these three allegations are procedurally defaulted.

Petitioner argues that the second allegation – relating to the timing of the anonymous phone call – was presented to state court.  It is not clear from the Illinois Supreme Court's opinion whether this is true.  In any event, we would still deny it because counsel's alleged failure did not cause any significant prejudice.  Petitioner's argument boils down to the fact that the anonymous phone call reporting the license plate number may have been made two weeks after the murder instead of two days.  This difference is not significant because Lebron testified that she immediately wrote the license plate number down.  *See Flores I*, 538 N.E.2d at 484.  Moreover, whether it was two days or two weeks, it still was made much closer in time to the murder than the later report, which was made 11 months after the murder.

### D.    The Prosecutor's Reference To Petitioner's Decision Not To Testify.

In Count V, petitioner alleges that the prosecutor violated his Fifth Amendment right not to testify when he made the following remark in his closing argument at the guilt-innocence phase of the trial:

> The testimony that Victor Flores gave from the stand is unrebutted.  There's nothing in this trial that has called him a liar or said that he was wrong.

(R. 472.) On direct appeal, the Illinois Supreme Court rejected this argument, holding that the statement when viewed in context was merely an attempt to comment on defense counsel's effort to undermine Victor's credibility and was not an impermissible attempt to comment on petitioner's failure to testify. *Flores I*, 538 N.E.2d at 492. The Court also concluded that, even if the remark created an improper impression, it was cured by the subsequent jury instructions. *Id.* We agree with this analysis and also with the reasons set forth in the State's briefs.

      **E.**     **The Trial Court's Failure Inquire Into The Jury's Expressed Fear About Security.**

In Count VI, petitioner alleges that the trial court failed to adequately inquire into the "source, nature, extent and possible effect" of the jury's concern about security. *See* Pet. ¶¶ 130-34. This concern was expressed in a note sent to the trial judge. On direct appeal, the Illinois Supreme Court rejected this claim. *Flores I*, 538 N.E.2d at 493-94. The Court noted that, after the trial judge discussed the issue with the jurors and reassured them about security, the jurors indicated that they were no longer concerned about security. *Id.* at 494. We agree with this analysis.

      **F.**     **The Trial Court's Refusal To Voir Dire The Jury Concerning A Newspaper Article.**

In Count VII, petitioner asserts that the trial court should have voir dired the jury to determine whether any jurors had read or been influenced by an article printed in the Chicago Tribune on the Friday before the Monday death penalty hearing. *See* Pet. ¶¶ 135-141. On direct appeal, the Illinois Supreme Court rejected this claim. *Flores I*, 538 N.E.2d at 494-95. We agree with the Court's conclusion that bringing this article to the attention of the jurors, absent any evidence that they had read it, could have done more harm than good. *Id.*

## <u>CONCLUSION</u>

For the reasons set forth above, the petition for writ of habeas corpus is denied.


**ENTER:**

_John A. Nordberg_

**JOHN A. NORDBERG**
**Senior United States District Court Judge**


**DATED:** October 5, 2007